IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | | |
|---|---|---|
| GEORGE WASSMANN | ) | |
| | ) | Cause No. CV-10-137-BLG-RFC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| NOBLE ENERGY, INC. and CAPSTAR | ) | |
| DRILLING, INC., f/n/a ELENBERG | ) | |
| EXPLORATION COMPANY, INC., and | ) | |
| ELENBURG EXPLORATION | ) | |
| COMPANY, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

I. **INTRODUCTION**

Plaintiff George Wassman brings this action to recover for injuries sustained during an accident on an oil drilling rig in Northeastern Montana. Named as Defendants are Noble Energy, Inc., the owner of the oil well, and Capster Drilling, Inc., the company Noble contracted to drill the well. Wassman was employed by another contractor, Sanjel USA, Inc., a non-party who Noble had hired to case the well with cement. Pending before the Court are motions for summary judgment filed by Defendants. Noble argues it is entitled to judgment as a matter of law because it is general contractor who has no duty to the employee of an independent

1

contractor.  Capstar argues it is entitled to partial summary judgment that it did not violate OSHA regulations by not having guardrails on its drilling rig.

For the following reasons, both motions must be granted.

## II.   FACTUAL BACKGROUND

In July of 2008, work was taking place on an oil drilling rig north of Saco, Montana.  Defendant Noble Energy, Inc. had contracted with Defendant Capstar Drilling, Inc.[1], to drill the well and with Sanjel, USA, Inc. to line the surface casing of the well with liquid cement once drilling was complete.  Noble did not own any of the equipment being used at the well site, did not conduct any safety meetings or set any safety standards at the site, and only one of its employees ever visited the site.

On July 25, 2008, Wassman, a Sanjel employee, was working as a pump truck operator at the site under the contract between Noble and Sanjel.  According to Wassman, all drilling operations had ceased and drilling machinery was no longer being used, but the job had not yet been completed and accepted by Noble because Sanjel had not completed the cementing.  Wassman placed one end of a hose on the deck of a small portable drilling rig that was thirty inches off the

---

[1]At the time of the contract, Capstar was known as Elenburg Exploration Company.

ground.  The drilling rig was owned by Capstar.  He then climbed onto the deck of the drilling rig to help his supervisor connect the hose to the pumping head so that liquid cement could be pumped down into the well casing.  After handing his supervisor one end of the hose, Wassman backed up to get a better grip on it.  In doing so, he lost his balance as his foot slipped in the drilling mud that had accumulated on the deck.  He fell backwards off the 30 inch-tall deck and broke his ankle.  Unlike other drilling rigs Wassman had worked on, this rig did not have hand rails or safety chains and there was no lighting specifically for the steps.

Wassman was covered by workers compensation through his employment with Sanjel.  In 2010, he filed this action against Noble and Capstar, seeking further compensation for his injuries.

### III.  ANALYSIS

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c)(2).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit

under the governing law. *Anderson, v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *Anderson*, 477 U.S. at 256-57. Once the moving party has done so, the burden shifts to the opposing party to set forth specific facts showing there is a genuine issue for trial. *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Id.*

On summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Id.* The court should not weigh the evidence and determine the truth of the matter, but determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

## A.  NOBLE'S MOTION FOR SUMMARY JUDGMENT

As a general rule, a general contractor, employer, or owner has no legal duty to prevent injuries to the employees of an independent contractor. *Fabich v. PPL Montana, LLC,* 170 P.3d 943, 947 (Mont. 2007). But there are three recognized exceptions to this rule: (1) the contract imposes a non-delegable duty to provide a

4

safe work site; (2) the injury arose from work that is inherently dangerous or hazardous; and (3) the owner retained authority to direct the manner in which the work was performed and knew or should have known that the independent contractor was performing work in an unreasonably dangerous manner. *Id.* at 947-949.

Noble argues it had no duty to Wassman because none of these exceptions apply. Wassman concedes the inherently dangerous activity exception is inapplicable. *Doc. 29, p. 7.* Further, although Wassman does not directly concede that Noble did not retain control over the subcontractors, his argument as to control relies on the contract and he cites Noble's admission that it did not exercise any control over safety at the well site. *Doc. 29, p. 6.* Accordingly, the issue is whether Noble owed Wassman a contractual, non-delegable duty to provide a safe work site.

The question of whether or not a duty of care exists is a question of law for this Court to decide. *Gibby v. Noranda Minerals Corp.,* 905 P.2d 126, 128 (Mont. 1995). Moreover, the interpretation of contracts is also a question of law that falls within the purview of the Court. *Wurl v. Polson School Dist. No. 23,* 127 P.3d 436, 441 (Mont. 2006).

5

Noble argues that the Noble-Sanjel "Master Work or Service Contract" expressly disclaims any such non-delegable duty on the part of Noble. That contract provides that Sanjel "shall perform work or services hereunder as an independent contractor. [Noble] shall exercise no control over [Sanjel's] employees, servants, agents or representatives, nor those of its subcontractor(s), nor the methods or means employed by [Sanjel] in the performance of such work or services, [Noble] being solely interested in the attainment of desired results." *Doc. 21-5, p. 3.* Noble is correct that this contract does not give rise to any duty toward Wassman. Wassman does not argue otherwise.

 But Wassman argues the contract between Sanjel and Noble is not the relevant contract. According to Wassman, the contract between Noble and Capstar controls, and under that contract, either Noble or Capstar assumed responsibility for safety at the site, and since there are disputed issues of material fact as to who was responsible for safety at the well site, summary judgment in favor of Noble is precluded.

Wassman claims the well cementing contract between Noble and Sanjel cannot be considered in determining whether Noble had a non-delegable duty toward him because "under Montana law, 'there is no way' the conduct of the

Plaintiff's employer can affect the Plaintiff's recovery." *Doc. 29, p. 5 citing*

*Reynolds v. United States,* 929 P.2d 844, 846 (Mont. 1996) and *Wetch v. Unique*

*Concrete,* 888 P.2d 425 (Mont. 1995).  Specifically, Wassman argues that Montana

law prohibiting defendants from blaming non-parties in order to reduce their

liability prohibits Sanjel from "contracting away" Wassman's right to full legal

redress.

  But *Reynolds* and *Wetch* are inapposite.  The certified question posed to the

Montana Supreme Court in *Reynolds* was whether a statute permitting the trier of

fact to apportion negligence against an injured worker's employer or fellow

employee violated the worker's right to full legal redress against liable third parties

for injuries incurred in employment.  929 P.2d at 844.  Noting that the issue had

been affirmatively answered in a prior case, the Court held that "since the immune

employer and co-employee can be neither apportioned liability or negligence as

non-parties, nor named, sued and, thereby apportioned liability or negligence as

parties, there is no way in which the injured worker's third-party recovery can be

reduced as a result of any conduct by the employer or co-employee."  929 P.2d at

846.  Similarly, *Wetch* addressed whether a district court properly excluded

evidence of the employer's negligence in an employee's tort action against a

contractor performing construction at the place of employment. 888 P.2d at 427.

Although the Court presumes that Worker's Compensation immunity is the reason Sanjel is not a party to this action, Noble is not trying to apportion liability to Sanjel. Noble merely argues the contract under which Wassman was performing governs the relationship between Noble and Wassman and that it does not impose a non-delegable duty on Noble to maintain a safe work site. Accordingly, the rule preventing assignment of liability to an empty chair is not implicated here. And Wassman cites no other authority requiring the Court to disregard Noble's contract with Sanjel in determining whether Noble owed a non-delegable duty to Sanjel's employee.

Here, Noble contracted with Capstar to drill the gas well. *Doc. 21, ¶ 1; doc. 30, ¶ 1.* Noble also contracted with Sanjel to line the surface casing of the well with cement. *Doc. 21, ¶ 2; doc. 30, ¶ 2.* Noble cites Wassman's deposition testimony for the fact that at the time of his injury, no drilling machinery was being used and all drilling operations had ceased. *Doc. 21, ¶¶ 4-5.* Although Wassman asserts in its statement of genuine issues that at the time of his injury "the drilling job had not been completed and accepted by Noble under the contract," *doc. 30, ¶ 3,* the deposition testimony from Jim Short cited in support of this statement does

not say that.  It is clear, however, that the cementing operations were underway.
*Doc. 30, ¶ 4.*  Moreover, according to Wassman's testimony the only people on the
drilling platform at the time of his injury were Sanjel employees.  *Doc. 21-3, p. 3.*

Under these facts, it is hard to see how the contract between Noble and
Capstar is relevant to the relationship between Noble and a Sanjel employee.  More
importantly, even if that contract was relevant to the relationship between Noble
and Wassman, it does not impose a non-delegable duty on Noble.

First, the Noble-Capstar contract, which is a "Model Turnkey Contract"
drafted by the "International Association of Drilling Contractors," makes plain that
it is "by and between" Noble and Capstar.  *Doc. 30-1, p. 1.*  In further provides in
relevant part:

> For purposes hereof, the term "Turnkey" or "Turnkey Basis"
> means [Capstar] shall furnish the equipment, labor, and perform
> services as herein provided to drill a well, as specified by
> [Noble], to the Turnkey Depth.  Subject to terms and conditions
> hereof, payment to [Capstar] at a stipulated price is earned upon
> attaining such Turnkey Depth and completion of the other
> obligations of [Capstar] hereunder. While drilling on a Turnkey
> Basis [Capstar] shall direct, supervise and control drilling
> operations and assumes certain liabilities to the extent
> specifically provided for herein.  Notwithstanding that this is a
> Turnkey Basis Contract, [Capstar and Noble] recognize that
> certain portions of the operations as hereinafter designated, may
> be performed on a Daywork Basis.  For purposes hereof the
> term "Daywork" or "Daywork Basis" means [Capstar] shall

furnish equipment, labor, and perform services as herein
provided, for a specified sum per day under the direction,
supervision an control of [Noble] (inclusive of any employee,
agent, consultant, or subcontractor engaged by [Noble] to direct
drilling operations).   *When operating on a Daywork Basis,*
*[Capstar] shall be fully paid at the applicable rates of*
*payments and assumes only the obligations and liabilities*
*stated herein as being applicable during Daywork operations.*
*Except for such obligations and liabilities specifically assumed*
*by [Capstar], [Noble] shall be solely responsible and assumes*
*liability for all consequences of operations by both parties*
*while on a Daywork Basis, including results and all other risks*
*or liabilities in or incident to such operations.*

*Id.* (emphasis in original).

Moreover, Exhibit A to the contract expressly designates what "Equipment,

Materials, And Services" are to be provided by Noble or Capstar, and whether the

services are to be performed on a Turnkey or Daywork Basis.  *Id., pp. 9-12.*

Significantly, the contract does not designate any work that is to be performed on a

Daywork.  All work performed under the Noble-Capstar contract was performed

on a Turnkey Basis.  Since the contract plainly provides that "[w]hile drilling on a

Turnkey Basis [Capstar] shall direct, supervise and control drilling operations and

assume[] certain liabilities to the extent specifically provided for herein," the

Noble-Capstar contract cannot be read to impose a non-delegable duty of safety on

Noble.

10

Wassman maintains that under section 82(f) of Exhibit A to the Noble-Capstar contract Noble was responsible for the cementing services.  While that is true, and the reason Noble contracted with Sanjel, there is nothing within the Noble-Capstar contract that imposes on Noble a non-delegable duty to ensure the safety of the cementing process.  Section 82(f) provides only that "cement and cementing service" are to be provided "by and at the expense of" Noble.  *Doc. 30-1, p. 10.*  And like every other service identified in Exhibit A, it is to be performed on a Turnkey Basis.  Read literally, that would mean that Capstar was required to "direct, supervise and control" the operation.

Accordingly, there being no contractual provision imposing a non-delegable duty on Noble, its Motion for Summary Judgment must be granted.

### B.   CAPSTAR'S MOTION FOR SUMMARY JUDGMENT

In paragraph 11 of the Complaint, Wasserman alleges

Plaintiff's injuries and damages were directly, proximately and substantially caused by Defendants' violations of OSHA and other applicable  safety regulations, including those requiring the installation of safety handrails on the access steps.

It is unclear whether Wassman fell off the platform or the stairs, *see doc. 24, pp. 2-3,* but since the OSHA regulations cover both, the discrepancy is irrelevant for purposes of this motion.  In discovery, Wassman identified 29 C.F.R. § 1910.23 as

11

the OSHA regulation relating to handrails and guardrails.[2]

With respect to platforms, OSHA requires that "[e]very open-sided floor or platform *4 feet or more above adjacent floor or ground level* shall be guarded by a standard railing [] on all open sides except where there is entrance to a ramp, stairway, or fixed ladder." 29 C.F.R. § 1910.23(c)(1). Wassman has not pointed to any regulatory requirement that platforms under 4 feet tall have any railings or guard rails. Since it is undisputed that the drilling rig platform was 30 inches high, *doc. 23, ¶ 7*, there is no violation of 29 C.F.R. § 1910.23(c)(1) for failing to provide guardrails around the drilling rig platform.

As to stairway railings and guards, "[e]very flight of stairs having four or more risers shall be equipped with standard stair railings or standard handrails" based on the width of the stair. 29 C.F.R. § 1910.23(d)(1). A "riser" is "the upright member of a step situated at the back of a lower tread and near the leading edge of the next higher tread." 29 C.F.R. § 1910.21(b)(7). A "tread" is the "horizontal member of a step." 29 C.F.R. § 1910.21(b)(9). Under these regulations, a "riser" requires a "lower" and a "next higher" tread and the area between the ground and the first step is not a riser. *William E. Brock, Secr. Of*

---

[2]Although Wassman's interrogatory response also cites 29 C.F.R. § 1910.22, this regulation applies only to "permanent places of employment."

*Labor v. Thermal Reduction Corporation,* 1986-1987 O.S.H.D. (CCH) P 27583,

1986 WL 53480, * 20 (O.S.H.R.C. 1986).  Since it is undisputed that the stairs

involved in Wassman's accident had only three risers, *doc. 23-5, p. 6,* there is no

violation of 29 C.F.R. § 1910.23(d)(1) for failing to have handrails.

Wassman does not challenge the inapplicability of §§ 1910.23(c)(1) and

(d)(1), and in fact concedes there are no specific regulations which apply to

Capstar's drilling platform, *doc. 31, p. 1.,* but argues that Defendants are still

subject to OSHA's "general duty clause" and must therefore provide a workplace

free from recognized hazards.  The general duty clause provides that employers

"shall furnish to each of his employees employment and a place of employment

which are free from recognized hazards that are causing or are likely to cause death

or serious physical harm to his employees."  29 U.S.C. § 654(a)(1). Wassman cites

*American Smelting and Refining Co. v. OSHA,* 501 F.2d 504, 512 (8th Cir. 1974),

for the proposition that the general duty clause still requires the elimination of

recognized workplace hazards, even in the absence of specific applicable

regulations.

Wassman's reading of *American Smelting,* however, is incorrect.  In that

case, the court said that "use of the general duty clause ordinarily should not be

available when a specific standard has been promulgated." *Id.* Wassman

apparently argues that because the regulations do not state that no guardrails are

required for platforms under 4 feet and that no handrails are required for stairways

having three or less risers, no specific standard has been promulgated. Nonsense.

Since there are specific OSHA standards for guardrails and handrails, the general

duty clause is inapplicable.

Wassman further argues that on account of this general duty, Capstar must

be prevented from arguing to the jury that it complied with the OSHA regulations

or that it had no duty to him because there were no specific regulations applicable

to its drilling rig platform. But pending before the Court is Capstar's motion for

partial summary judgment on Wassman's claim that Capstar violated OSHA

regulations regarding handrails and guardrails. Limitations on arguments and

evidence are best addressed through motions in limine and Wassman has filed no

such motion.

## IV.   ORDER

For those reasons, **IT IS HEREBY ORDERED** that:

(1) Noble's Motion for Summary Judgment (*doc. 19*) is **GRANTED**; and

(2) Capstar's Motion for Partial Summary Judgment (*doc. 22*) is also

14

**GRANTED**: Defendants are granted judgment as a matter of law on Wassman's

claim that Defendants violated OSHA regulations regarding handrails and

guardrails (*see Complaint, ¶ 11*).

Dated this 16th day of March, 2012.

/s/ Richard F. Cebull_____
Richard F. Cebull
United States District Judge